The court will proceed to the second case of the day, the United States v. Chaparro. Mr. Wright. Good morning, your honors. And may it please the court. Stephen Wright, University of Wisconsin Madison Law School, on behalf of Defendant Appellant Mike Chaparro. Your honors, in our brief, we outlined three grounds that we believe warrant relief. I'd like to begin by focusing on the second one, if that's OK. The district court's interpretation of 18 U.S.C. 3153, the Organization and Administration of Pretrial Services Statute. As we outlined in our brief, your honors, the district court's interpretation conflicts with the text of the statute, the history of the statute, and the policy underlying the statute. Each of those, the text, the history, the policy, makes pretty clear that Congress wanted to create a system of trust between pretrial services and a defendant. And an essential element of that trust is keeping conversations between a defendant and pretrial services confidential. I do think it's important, right off the bat, to make sure that we're all sort of on the same page about what statements are at issue. The government's brief cites a series of cases that make this appear to be a case of prior inconsistent statements. But as I hope we outline in our reply brief, those aren't the statements being challenged here. We are specifically challenging those statements made during pretrial services interview by the defendant and that were later used to impeach Uncle Eddie Ramos. That is made clear from the statements and the questions that we cite in the record, as well as the district court's instruction to jurors that the statements of the defendant were only used to affect the credibility of Uncle Eddie. If I can return, then, particularly to the text, the district court relied primarily upon one line in the statute that discusses information made confidential under the paragraph cannot be used to determine an issue of guilt. There are three reasons why I believe that that reading of the statute is incorrect. The first is it fails to look at the statute as a whole. As I said, the Organization and Administration of Pretrial Services Statute speaks in terms of pretrial services. A1 talks about the subject of A1 is the chief pretrial services. Two is the chief pretrial services officer. And three talks in particular about the chief probation officer. What I think is important here is that the district court relied upon C3, but it failed to look at C2, which specifically says that pretrial services can make a series of exceptions. And I think the proper interpretation of C3, therefore, is that this acts as a constraint upon pretrial services' ability to make exceptions. The second reason I think that that's incorrect is, as the panel no doubt knows, a standard rule statutory interpretation is that the text cannot conflict with either the clear plain, the language of the statute cannot conflict with the clear policy that underlies the statute. That's a pretty shaky argument, I got to say. I thought your better argument, if you want to argue that the text can be contradicted by the purpose, you're going to run into trouble. Since we know that virtually every statute we have set off and the Supreme Court has set off on compromises. And this statute reflects compromises between competing purposes. I thought your better argument was that the Supreme Court, in exclusionary rule cases and other statutes, has said, yeah, you can impeach the defendant with his own prior statements, even if they were made un-Mirandized or otherwise were unlawful. But you can't, under James against Illinois,  Yes, and I agree, Your Honor. And if I could ask you about just how this works in practice. Defense counsel newly assigned to a defendant just taken into custody, pretrial services needs to work up the case very fast, right? And so defendant turns to his lawyer and says, what should I do? Should I answer their questions or not? I've got all these Miranda warnings, what do I do, Counselor? How does your advice differ depending on whether he could be impeached with his own statements versus any defense witness can be impeached with his statements? Well, so I don't know if the advice changes necessarily based upon what happens at pretrial services, but I do think that advice would end up dictating whether the defendant testifies at trial. I think a lawyer, the same way as if there had been a un-Mirandized confession, the counsel at the time of trial would engage in the calculus that Your Honor suggests. I think the better position probably, if I were counsel, would be to advise my client in the case that the client's own words could be used to impeach, to be truthful and to participate in the pretrial services interview, but to handle that down the line. Now, if I'm an attorney and I'm offering advice and I know that my client's words can be used to impeach someone else, then in those circumstances, yes, Your Honor, I would advise my client, no, don't say anything because it can effectively be used, introduced to the jury, perhaps as an impeachment down the road. If it would, you'd have to know what your defense theory was going to be at the time of the pretrial services interview, right? You would, yeah. So that would seem to me to really discourage the trust that you've talked about, or at least the candor that the courts count upon to make sound pretrial detention decisions. Yes, Your Honor. Counsel, let me ask you about what prejudice, let's assume that it was an error to introduce the statement to impeach Uncle Eddie. He had other credibility problems. I mean, would that really have affected that one statement to you, truly think, given his prior conviction, the convenience of his story, that the jury would have believed him safe? I think there's two issues there, Your Honor. The first is, as we sign our reply brief, any time that you end up using the defendant's own words against them, any time that you use some type of confession, it has a disproportionate and harmful effect upon a jury. So I don't know if we can just look at it in isolation in those terms. The second point that I guess I would raise, Your Honor, is, as we, I hope, outlined in our insufficiency, there was very little evidence tying the defendant to the house. Well, it was circumstantial. It was circumstantial. Well, there was very little evidence tying him to the house two years earlier. There was circumstantial evidence that said that that was his room at the time of the search. But the record is almost completely devoid of any indication that he was there two years earlier. And so by the government specifically asking, did he say where he was two years ago, which is a summaration, or my summary, of what happened, I do believe that it actually ended up helping further the government's case that he was there at the time, which is what they needed, because that computer in that room hadn't been turned on for a very long time. I guess, perhaps, that's a good transition to my first argument, which deals with the sufficiency of the evidence. Mr. Shapiro was convicted of three counts. The second count deals with the phone and image GX85. The evidence is fairly thin that it actually ties Mr. Shapiro to the phone. The parties don't dispute that the phone was on Mr. Shapiro at the time. But what makes it interesting is the phone was not password protected. The torrent that was used on the phone was not password protected. And during the course of their search,  that, indeed, there was only one phone found in the house. This supports the testimony, or at least the assumption that this was a shared device. The government seemed, at many times, to be fairly specific that they didn't have to eliminate every single person in the home. I fundamentally think that that's incorrect, that the government introduced no evidence, or at least insufficient evidence, that this phone was, excuse me, that this phone could not have belonged to someone else. I'd also like to, so sorry, returning back to issue number two, the pretrial services statute. One thing that I do also think is fairly important here is this case is fairly unique from all the other cases that have been cited in the sense that we actually heard from pretrial services in this case. The pretrial service officer was called and offered the official position that the statements made by the defendant should not be introduced at any point during the trial. That's an element that doesn't appear in any of the other cases that appear that the government cites in the record. If there are no other questions, I think I'll actually sit down. Yeah, Mr. Wright, while this may be a case of first impression in this court, other circuits have addressed this. Thank you for the question, Your Honor. I actually think this is an issue of first impression nationally, the pretrial services statute. We can find no other case where the defendant's words were used to impeach a third party witness. The government's brief is correct that if the court chooses to view this as a prior inconsistent statement case, there are several circuits that have decided that under those circumstances, using those statements for impeachment is appropriate. But I just don't think the record supports the conclusion that this is a prior inconsistent statement case. Want to save some time for rebuttal? That would be great. Thank you, Your Honor. Thank you, sir. Mr. Love. Good morning to the court.  May it please the court. I will turn to what was first brought up by counsel and the court and the testimony from the pretrial services officer. There was no violation of the statute. The authorities allowed, authorities cited at the time during the trial, and later in the briefs, allowed statements to be used for impeachment. In this case, they've allowed the defendant's words to be used to impeach the defendant. Could you address the James against Illinois issue? I understand, Your Honor. Which I don't think is mentioned in your brief. No, it isn't. The way this played out in the trial was that the district court approved the testimony of Mr. Wheatley based on authorities that it had found in the government. The Griffith case from the Second Circuit, right? Correct. Then the court read an instruction. Now, the instruction was drafted by the government, submitted to the court. It was provided to defense counsel. Defense counsel was asked by the district court if he had any objections. He said no. He embraced the language of the instruction. And then Mr. Wheatley was called to testify. During the direct examination. The defense never consented. They didn't remove their objection to his testimony, did they? No. Absolutely not, Your Honor. They did not consent to his testimony. They did embrace the language of the instruction as proposed by the government. And then the government did its direct examination. And at that point, it only asked about the statements of the defendant. And I can understand why the defense has argued that there was perhaps bad faith on behalf of the government. But I would ask the court to go on and look at, then, the cross-examination of the defendant, of Mr. Wheatley, and then the redirect by the government. And here's why. The cross-examination was broad enough for the government to come back on redirect and ask Mr. Wheatley whether he had spoken to Mr. Ramos and bring up the impeachment of Mr. Ramos. Mr. Ramos' prior statement. So both of them were there. But there's nothing in the cross-examination that compelled the government to go there. I think a fair reading of the record is that the government made a mistake in terms of stopping too soon in its direct examination, but clarified that and minimized any potential prejudice by going forward and, in the redirect, bringing out Mr. Ramos' statement. Which, by the way, Your Honor, did not differ from the defendant's statement. It was the same. So the defendant didn't add anything. And the government then never argued anything about guilt. Its only argument had to do with the credibility of Mr. Ramos. Can you direct us to any other prosecutions  to pretrial services on the initial interview have been used to impeach defense witnesses other than the defendant? No, Your Honor. I'll just share some thoughts, I guess. I can completely understand how, in a particular trial, the belief that Uncle Eddie is lying, and you can prove it, would lead you to want to seek this impeachment. And the district judge would be inclined to go along with that. My concerns here are much more systemic about how the courts can deal with pretrial detention and other pretrial services issues quickly, and what incentives defense counsel and defendants will have if we approve of this impeachment of the defense witness. Could you address that? I understand the systemic problems that the court addressed earlier in questioning other counsel. I can only say that there are but a handful of cases around the country that talk about this issue or bring up the issue of pretrial services officer's testimony. And with a few instances, I find it hard to believe that it will create, in fact, an impediment to defense counsel and clients at their early meetings, in general, deciding that they just can't cooperate with pretrial services because it might be used against them at a later time. I find it difficult to believe that would happen. Why are you so confident about that? Because these are exceptions. Because these cases are exceptions. It's not a general practice. But defendants don't testify that often, so the cases permitting defendants to be impeached aren't. I think if we held that witnesses could be impeached with defendants' pretrial statements, then that road is open and we may see more. It's difficult to ask the court to take that step. In this, I would ask the court, though, to consider the circumstances in this case, in particular. And what was shown by the testimony of the pretrial services officer was that the defendant had made statements to him about where he lived. The pretrial services officer then confirmed those statements with Mr. Ramos. At the time in trial, the record can be read to show that it would have, to ask the pretrial services, did you confirm where he lived without any idea of what the original statement was that was being confirmed would have been difficult. Is it possible in hindsight that? Couldn't you just ask Uncle Eddie at trial, where did he live at the time? Didn't you say, he then says, not here. And then you say, did you tell Mr. Wheatley something different two years ago? No. We did not confront the defendant with that statement. Uncle Eddie. I'm sorry. Uncle Eddie. Mr. Ramos. We did not confront him with that statement at the time. We weren't required to. But I thought your point here was that you could have, and since you could have, this wasn't that big of a deal, because Uncle Eddie could have been impeached with his own confirmation to the pretrial services officer. I meant that Uncle Eddie could be impeached by the pretrial services officer with his prior statement. With his prior statement, right. Yes. Did I miss a point there? No. No. I might have just misunderstood the point you were trying to make. OK, thank you. Could you talk about the prejudice? Let's assume that this was an error. Could you talk about prejudice? I think there's a lack of prejudice, Your Honor, because A, there was an instruction. And the instruction specifically dealt with not considering the testimony or any statements of the defendant except for credibility of Mr. Ramos. Secondly, Mr. Ramos' prior inconsistent statement was, or prior inconsistent statement, it was the same as the defendant's. So the fact that the defendants came in didn't really add anything much, I think I have to be fair and say much, to what Mr. Ramos had stated to the pretrial services officer. So when the pretrial services officer said, Mr. Ramos had said that, it doesn't enlarge the idea about where the defendant lived during that time period. But if I understood what you told us at the beginning, though, the impeachment of Ramos began with what defendant Chaparro had said. That's correct, Your Honor. And I stand by that in terms of bad faith. And I would ask, again, the court to look at that, the way that played out in the direct, cross, and redirect. I don't think the cross-examination compelled the government to cure a problem, but it did cure a problem. How would this work in, for example, you're an experienced prosecutor in immunized proffer sessions. You can use proffer session statements later to impeach, can't you sometimes? Yes, Your Honor. Can you use them to impeach any witnesses other than the proffering defendant? No particular circumstances that we would try and do that. That would make it much, much more difficult to try to proffer, right? I agree, Your Honor. How different is this? Is it just the scope of the discussion in pretrial services? In this case, Your Honor, I really have to take that extra step and say it's different because it really went to the credibility of Mr. Ramos, as opposed to the defendant's statement being used as an incriminating statement, which it was not used as. It's out there, but it's not used that way by the government, and certainly not argued that way in closing. It would be hard for the jury to miss the significance of it. Those are the kinds of limiting instructions that we don't have that much confidence in, right? It was pretty explicit. Limit the defendant's confession to the issue of credibility is not a key fact. It was pretty explicit, though, Judge, on that specific point. Yeah. So with regard to the sufficiency of the evidence, there was sufficient evidence to support the jury's verdict in this case. There were three devices involved. When you look at the evidence on each of those devices, or evidence about those devices collectively, the evidence about each device supports the conclusion that not only that device was used by the defendant to commit a crime, but that the other devices were used by the defendant to commit a crime. The defendant is the only person across the three devices, the only person in common with those three devices. BitTorrent, a file sharing program, was used or had been used on all three devices. In fact, on two of the devices, the hard drive and the computer that was used for the downloads to the undercover officers, there was an unusual version of BitTorrent called TXOTI, which the undercover agent testified was he hadn't seen it in hundreds of investigations. So it was rare based on his experience. But I also can go through the individual items, starting with the hard drive. This is perhaps the clearest. The defendant's username was a variation of Michael. It was Mikey. But instead of an I, it was the numeral 1. And it was password protected. It had been used for searches for child pornography torrents. A torrent is the name given to files that are shared on the torrent network. Searches were done on that computer for child pornography terms. Child porn was, those specific words were in the name of a torrent file. And when that file was opened, that name, child porn, would have appeared on the screen. There was a directory created by the user that was web video collection slash pre-teen. And the defendant, or the users, and in this case the defendant's knowledge with regard to BitTorrent was sufficient enough so that the default settings for the BitTorrent program that were on that computer had been changed. So it wasn't just downloaded, used as is. Default settings had, somebody had to go in and affirmatively change those default settings. The phone was found on the defendant's person. Now, the evidence focused on November 24th. And I would cite government exhibits 212 and 213, which have a list of the uses of the phone on that date from approximately 9 in the morning until about 1 o'clock in the afternoon. And they start off with searches for child pornography websites, then general searches for child pornography, then a viewing of four separate child pornography images, and finally, a text on that very same day from Mike to another person. With regard to the third device, the device from which the undercovers did their download, there was no computer found. But when the residence was searched, that computer was not recovered. But it had been used at that residence, as could be told from the tracking of the IP address. It was using TXADI, that unusual type of BitTorrent software. There was a torrent on there that had the number 817 in its title. It was a very long title, so just refer to it as 817. There were remnants of that same torrent on the hard drive in unallocated space, but remnants of it nonetheless. So it had been on that hard drive at one time. And finally, on the shelf in the defendant's bedroom was found an empty Gateway laptop box. And with the pictures from the search that the serial numbers and model, et cetera, on that laptop box were visible. And there was testimony that no computer with that serial number or model number was found during the search. So there was a missing computer in addition. And collectively, those things, and they are intertwined with regard to the three devices. They have some individual separate evidence about them, but they are intertwined to some extent. Show that there was sufficient evidence for conviction on all three counts. If there are no questions from the panel, I'll sit down. Thank you, Mr. Low. That's right. Your Honor, perhaps the best places to follow up is beginning with the insufficiency. I heard the government repeatedly say the cases are intertwined. And I think that's largely because no count on its own really holds water. In count one, on the transport charge, the parties do not dispute they never actually found the computer that was communicating with officials in Pennsylvania. On count two of the phone, yes, it was on his person. And yes, there happened to be a text message on there. But the government's evidence really didn't show, really didn't disprove that it could have belonged to somebody else. As I said, there was only one phone found. The government searched, the government set up a lab on site at the home. They searched many, many of the devices on there. The record is clear. They seized, that they secured the family. And then they went around the home looking for all internet ready devices. And that produced the search, the testimony is, of one phone. That phone was not password protected. And as some of the cases make clear that we cite in the record, neither the phone was protected, nor was the torrent software used protected. The government correctly identifies that this was a unique type of torrent. But let's be clear, the testimony from the experts about what a torrent is says that torrents are generally available devices used to share information. The examples that the government's expert used, for example, was people use it to download Wonder Woman. So there's nothing particularly nefarious about, at least according to the government's witness, about actually having a bit torrent on one's phone. Likewise, for account three, the record is that there had once been a torrent and illegal images on there, but that those images had been deleted. So the government was really looking at what they called shell bags or deleted folders. Yes, there was a username. But once again, there's nothing really to discount the possibility that these were shared devices. And disproving that is an essential component of overcoming the insufficiency claim. Can I ask you to address the question, whether it's framed in terms of prejudice or harmlessness, on the impeachment? Suppose for a moment that we agreed with you that using the defendant's statements to impeach Mr. Ramos was an error. Suppose we also thought that it was OK to impeach Mr. Ramos with his own prior statements. If the content of his prior statements and defendant's prior statements was essentially the same, how much harm would there have been? How much prejudice would there have been to the defendant? I still think it's significant because it's coming directly from the defendant. Fulminante, it's a confession from the defendant. Exactly. OK. Thank you. If there's nothing else, I think I have 10 seconds. Thank you, Your Honor. Thanks to all counsel. Professor Wright, I want to give you an extra thanks from the court for accepting this appeal and so aptly representing the defendant. It's been a pleasure. Thank you, Your Honor. Case is taken under advisement.